18-1994 Lewis B. Sanchez v. James J. Foley et al. May it please the Court, my name is Joseph Kittredge and I'm here on behalf of the appellant James Foley. With respect, Your Honor, I request a minute for rebuttal. Yes, you may have it. Thank you. Your Honor, this case revolves around, with regards to my client's appeal, him being singled out for the use of excessive force based on what we suggest was a clear lack of evidence to support that in addition to the award that was granted by the jury. Now, in this case, Your Honor, the only time that Trooper Foley was solely with and in physical contact with Mr. Sanchez was during the process of utilizing the phones for the Miranda warnings. And the evidence at the trial at that point in time was that Mr. Sanchez was expressing some difficulty in either understanding or communicating with the person on the phone that it's recorded that my client then says, hey, hey, come here, and then was either pushed Mr. Sanchez closer to the phone. And at that point in time, Mr. Sanchez became agitated and resulting in my client and the assistance of Trooper Sweet and Trooper Purtell to put him in handcuffs and then head him towards the cell block area. Counsel, can I ask about that audio recording? Isn't there a statement in your client that suggests considerable impatience with Mr. Sanchez on that audio recording? It may even sound somewhat threatening. I don't have the exact language in here, but I think you probably know what I'm referring to. Your Honor, I don't think it's threatening or impatience as much as asking for a clarification. He's trying to find, because of the lack of communication between he and Mr. Sanchez Isn't there something, I'll show you what your rights are or something to that effect? I don't recall that, Your Honor. The fact of the matter, Counsel, is I know the statement that Judge Lopez is referring to, and it's a statement that can be interpreted in more than one way. It can certainly be interpreted as hostile. It can also be interpreted, yeah, I'll show you what your rights are. I haven't listened to the audio tape, but it would be interesting to hear the tone. Your Honor. I understand your argument to be, even if it was a hostile tone, your client was only with Mr. Sanchez during the phone call, and there was no evidence that he was the only person with the plaintiff at the time the plaintiff was put into the cell, which is when the injury happened. Is that correct? Well, actually, Your Honor, the plaintiff advanced the theory that before he even got to the cell, before he even went into the cell block, that he suffered that head injury when he was hitting the door jam. And at that point in time, the evidence that was presented, I believe, was undisputed, was that... Your Honor. Okay, I'm sorry. Whether it's on the door jam into the cell or into the cell, it is different than the time period at the phone. Correct, Your Honor. All right. I thought your argument was the only evidence of your client being solely involved was at the phone. So what is the evidence about who took him to the entrance to the cell, the door jam, and then in the cell? The evidence that's presented at the trial, Your Honor, was that Troopers Patel and Sweet had either side of Mr. Sanchez, who was handcuffed at the time, and that as they guided towards the door that led into the cell block where the cells were, that one of the officers was knocked off. At this point in time, my client was following behind. He didn't have any physical contact with Mr. Sanchez. And it wasn't until after one of the Troopers or both the Troopers were knocked off at the doorway that he then took a grasp of Mr. Sanchez and led him towards the cell. I thought the evidence was that the doorway from the cell block into the cell block was so narrow that only one officer actually took him from that doorway to the cell. And there was evidence from which the jury could find that officer was Officer Foley. That's correct, Your Honor. It was Officer Foley who followed. And, of course, part of the injuries that are being claimed in this case is the plaintiff's claim that part of his injuries were that in the cell itself he was forcibly shoved headfirst into the toilet. No, Your Honor. I believe that the plaintiff's allegations are, and as presented even with the expert testimony, was that he was shoved into the doorjamb, causing the injury to his head. I know that's part of his allegations. So there's no evidence in this record that he was shoved into the toilet? There was allegations made by counsel, but the plaintiff doesn't say at all that he was shoved into the toilet. There is no evidence presented by any witness that he was shoved into the toilet. I thought it was your client's argument that the head injury occurred when he fell and hit his head on the toilet bowl. That's correct, Your Honor. And it wasn't your client's version that he wasn't pushed, but there was some difficulty getting him into the cell, and then they lost the grip on him, and he then fell and hit his head. Isn't that his version? That's correct, Your Honor. That's my client's version of what happened. All right. The plaintiff's version was that it occurred outside, and that, in effect, the plaintiff testified at the trial that he didn't even get into the cell, that the blood, and he was sitting in the hallway. He doesn't even mention being into the cell. And I suggest that it's based on that evidence that a jury, a reasonable jury, wouldn't be able to find that my client was responsible for the head injury. And the head injury was from which the damages flowed. There were medical bills. There was alleged excessive emotional distress, pain, and suffering. I'm sorry. I thought if the jury had accepted that he fell and hurt his head, and that's how he hurt his head, and then the argument is there was no excessive force. So you put the jury's findings together, and they seem to have accepted that it was being pushed into the doorframe that caused the head injury. And so you're saying your client had nothing to do with the pushing into the doorframe. Correct, Your Honor. And that was the evidence that was presented at the trial. What about Mr. De Leon, who's a civilian who happens to be there, I guess maybe for some other booking procedure, but he does testify, does he not, that the injury occurred when the individual, Mr. Sanchez, was slammed into the doorjamb. Doesn't he confirm that account? He does say that, Your Honor. But he also confirms that my client, Trooper Foley, was following behind, that he didn't have his hands on Mr. Sanchez at the point in time that Mr. Sanchez went into the doorjamb. Okay. Thank you. Good afternoon, Your Honors. My name is David Officer. I represent Trooper Daniel Pertell in this matter. If I may, Your Honors, I'm going to address the motion under Rule 54. Excuse me, there was a joint brief filed by Pertell and Sweet, but you're just representing Pertell? That's correct. Mr. Sweet's counsel will be after me addressing the Rule 59 motion. Thank you. In this case, the court below denied the defendant's motion for judgment as a matter of law at trial and after trial. We think that was error. Everyone agrees that to have a conspiracy, the plaintiff bears the burden to show there was a single plan, the essential nature and general scope of which was known to the participants. In this case, Your Honor, there's no evidence that the troopers had an agreement to do anything. I thought the law was fairly well established that the agreement need not be expressed, but can be tacit and can be inferred from conduct. Yes, Your Honor, we agree it can be inferred, but we say there's no conduct here. Well, if it's permissible, it must not be speculative. And in this case, I guess the easiest way is So here's a suspect who a jury could conclude is giving a trooper during an attempted booking a hard time. He's got to be put in the cell. All three troopers are placed as participating in the effort to place him into the cell. There's different testimony about who was holding which arm, etc. And there is testimony that the suspect then gets slammed into the doorjamb, to use the phrase that was just used, and then gets further injured, apparently, when he's actually placed in the cell. And that the reports which are filed seem to leave something to be desired as far as consistency and fidelity to the truth. And from those actions and that apparent cover-up, why can't a jury infer that there's a concerted plan here? If I may take this in reverse order, Your Honor, there were no reports, written reports, that were made part of the record of trial. I thought Trooper Foley filed a report and was cross-examined on it. The other two troopers didn't file reports. But you just said there were no reports. My mistake, Your Honor. Okay. If you're looking for reports that are suspiciously alike, there was no evidence of that. No, we're not looking for suspiciously alike. We're looking for variances between the report and the testimony at trial. And, Your Honor, under the Arbor case, the court has held that mere differing testimony by a witness does not in and of itself establish an agreement or a conspiracy. All right. Thank you. Good afternoon. May it please the Court, Dana Moynihan on behalf of Trooper Sweet, Michael Sweet. I would reiterate the Rule 50 argument of my brother on the Rule 50, however I'll focus for a moment, on the Rule 59 argument. And our position here is that the court applied the incorrect standard and that it did abuse its discretion in doing so. When looking at the court's decision, which we've challenged, the findings of the court were to isolate those facts, as we're supposed to do, circumstantial evidence showed that the defendants acted in concert in subduing Sanchez. True. Circumstantial evidence indicated that the defendant acted in concert in taking him towards the cell door. Not towards the cell, but the cell door. True. But from that, the court suggests that they could also believe that the defendant's testimony could be contradicted and that only Mr. Foley, Trooper Foley, entered the cell. Now, only Trooper Foley was present when he fell. And so, therefore, they could disbelieve all of the evidence. Well, our position is here that the incorrect standard was applied by the court. And in the decision of the court, it specifically says, based upon, I'm looking at page 80B04, based upon the totality of the evidence presented at trial and drawing all reasonable inferences in favor of the jury's verdict, the court concludes that there is no basis to reverse that verdict or allow a new trial as to the conspiracy claim against the defendant. So our position is on the 59. This was almost a forgotten analysis in the court's decision. And the court applied only the Rule 50 standard and not the 59 standard. And it's clear that the court seems to fail to address the Rule 59 standard in its five-page decision on the motions. And so we have to tell them. You, of course, immediately moved to reconsider and called back to Judge Casper's attention. Yes. I believe we did. And what happened on reconsideration? It was denied. Okay. And the motion for reconsideration was on that ground, that the Rule 59 standard had not been applied? We noted our exceptions, Your Honor, and our intent to seek relief from this court. No, you didn't answer the question. Did you expressly say to the district court you didn't use the Rule 59 standard? Frankly, I cannot answer truthfully if I did or not. Okay. All right. Thank you. Thank you. Good afternoon, members of the panel. My name is Hector Pinheiro. I represent the plaintiff, I believe, Luis Sanchez, and my co-counsel, Robert A. Scott, with me. I think there was sufficient evidence in this case for the judge to deny both the Rule 50 motion and the Rule 59 motion. One of the most important things in this case, I think, besides a testimony from live witnesses, is this 12-minute audio tape. Well, it would be helpful to me if you could very concisely lay out, one, two, three, four, five, what facts do you think add up to a civil conspiracy that implicates all three of these troopers in the liability here? Happy to do so, Judge. Just point to me. I don't need argument. Just point to pieces of evidence. I will. I'll connect the dots. Sanchez is being Brandeis. He doesn't have an understanding of what's going on. There's a confusion. The next thing that happens is he's told that he can get counsel. Apparently, he walks away from the booking table where the telephone system is. He's handcuffed. My brother admitted today, a little bit shocked, that he was handcuffed at the time. But be that as it may, the next thing that happens, there isn't any communication by Foley to tell him, I want you to tell him to move forward. You have to get closer to the phone. What he does is he grabs him by the neck. This is a testimony of Wilfredo de Leon, who's sitting feet away from the booking table. He's tied up to a bench. So the next thing that happens is there's a commotion. And you hear in this tape, you hear Sanchez fluctuating between English and Spanish. He says, amigo, the trooper says come here. What the F, my client says. My client repeats in Spanish, you cannot do that. You cannot force me. You cannot force me to do what you want me to do. In addition to that, as that happens, the two other troopers converge into the booking room. Patel takes the left side of Sanchez. Trooper Sweet takes the right side. And what Sanchez remembers is his body being bent down, and he can't really see what's happening. The next thing that we see, and this is seen by the testimony from Wilfredo de Leon and the testimony of Mr. Hua. Hua is another arrestee who is arrested in an OUI charge. But these two civilian witnesses contradict the police story in very indistinguishable ways. De Leon states that as they go through the door, he, my client said, is either, and these are his words, intentionally bumped against a door jamb, or he's not sure if he was simply bumped. So he could not make, he could not distinguish whether this was an intentional act or some type of accidental act. The important thing, I think, that goes to the heart of the conspiracy is that this is not part of the police narrative. The police ignore this portion of the plaintiff's facts. Now we have Mr. Hua, who's sitting maybe 10 feet away, and observing this. And what he says contradicts even the testimony that my brother, Mr. Kittredge, alleges the evidence established in the case. What Mr. Hua says is that the head of my client, he tells Mass State Police investigators from Internal Affairs, that his head, the crown of his head, hits a wall. And so the next thing he says is that the fat trooper, Mr. Foley, rolls over at the entrance of this threshold, and what he does is he doesn't think that his head hit the wall because he put his hand So we know that something happened at the entrance of the wall. In this sense, the tape is of extreme importance because there is a statement that you can hear as they go through the wall, as they go through the door, where one of the troopers, we're not exactly sure who, says, get out that door, oops. The next thing that happens, there's about a six second lapse. And now there's a dispute where Mr. De Leon, Mr. Hua, and the supervisor of these three defendants, who takes a statement from Trooper Foley to document the injury, states the three of them were in the cell room. The three of them left the booking room. And part of the conspiracy, I think the jury could have inferred, that Portell and Street were helping this guy out, but they didn't want to go all the way. They wanted to distance themselves to a certain extent. Now, wasn't it a police officer, I think Officer Bernstein, who, he placed the three individuals in the cell. Yes. Is that correct? Yes, Your Honor. That's what Trooper Foley told them, that the three of them were in the cell. That was based on a statement that Foley made to Bernstein, is that correct? An admission that he made to Trooper Foley. So from that evidence, I think a jury could have clearly concluded that there was a conspiracy, that things didn't go in the way that the police story or the police version went. We don't have video cameras. We don't have anything where we catch a wink or a nod. But the law establishes that as long as we have circumstantial evidence that something happened there, then that's enough to convict them of the conspiracy. Didn't your client say once he was in the cell, he's killing me? Yes, he did. Yes, he did, Your Honor. Okay, what do we derive from that? Well, I will answer. Even before that, there's something more important that happens, and I think this also goes to the heart of the conspiracy. The troopers know that they have an audience, an arrested audience, in De Leon and Waugh. They also know that when they go into the room, the phone system, the line is open, and that they can be heard, and the recordings are present. So once they go into the room, the most unusual thing happens. You hear, this is six seconds into entering the room, where Trooper Foley admits saying, oh, he fell. And it's very unusual because a few seconds later, his voice is a little bit more agitated. But what's unusual is a nonchalant tone of voice, which the jury, I think in this case, could have considered to establish that there was a conspiracy. This is a moment in time, this is a few seconds before Mr. Sanchez starts saying, they killed me, he killed me, I'm bleeding from the head, or whatever else he says, where they can say, or where he thought immediately, let's make this look like a fault. Oh, he fell. And so to that extent, I think there's ample evidence of a conspiracy, and there's ample evidence to support the remaining findings. The expert testimony also was supportive of the verdict. It's Foley who said he fell? Yes, he did, Your Honor. Okay, so how do you tie it to the other two? Well, the other two, so we know from Mr. de Leon that the two of them are inside, and that at some point in time, as this happened, there was some type of agreement. And part of the agreement is to support this ridiculous theory that my client falls inside of the cell. Here's another important thing. Did all three officers testify at the trial? Yes, they did, Judge. I call Mr. Foley. The other two were called by the little counselor. And did they all admit being in the cell area? No, the only person that admitted being in the cell was Mr. Foley. De Leon places all of them there, and Trooper Bernstein, based on the admission that is made by Foley, also includes them there. And so all of those are important things in terms of the conspiracy. I'm sorry, Judge. I still, even if they're all there, how does that show conspiracy by the other two? If they all participate in a cover-up, as you suggest, Foley was laying the groundwork for one, and then he attempted the cover-up. But what did the other two do to cover up? Well, we don't know what the other two did inside, because for the next thing that happens after the oopsie or oh, oh, he fell, there's about a 26 seconds of silence where I suggested to the jury, and even to Trooper Foley on cross-examination, that my client must have been unconscious, something that was denied by Trooper Foley. You're not answering my question. Maybe not, Your Honor. I'm asking about the other two and the evidence of conspiracy. Well, they didn't want to be placed in that room, and they denied that the injury happened outside or coming into the cell, and that their understanding of the facts was that he fell inside. Okay. So that's part of the cover-up. It is. It is. All right. And then you infer backwards from the cover-up that they were all in it together, an inference from the conduct. Precisely, Your Honor. Okay. On the excessive, and here's the other important thing. This is one of those unusual cases where none of the jury instructions that were given are being challenged here, from conspiracy, from the inconsistency of statements, from the use of force. And so switching on, I'm sorry, Your Honor. Yes, fine. But what about the failure to articulate the different standard for the new trial motion from the motion for judgment notwithstanding verdict? I don't think the judge did. I think the judge articulated it, and even if she didn't articulate it properly, this is an issue that was waived by the defendants. In that matter, I think they waived it in that sense, Judge. How did they waive it? I don't believe that there was a motion for reconsideration that was filed by counsel. There was simply one motion for a new trial. The judge entertained a motion for a new trial, and I don't, honest to goodness, I don't recall there being a motion for reconsideration to raise that issue. Why do you have to file to reconsider if the judge has used the wrong legal standard for the motion for a new trial? I suppose you don't. You don't have to. You don't. You don't waive by not doing that. It would have been helpful. All right. So I thought you were going to say, gee, she may not have articulated the right standard, but the result would have been the same. Yes, and I think the judge independently waived the evidence. Did either the motion for new trial or your objection to it lay out the appropriate standard? I thought we did, Judge. So just to cover, unless the Court has any other questions on the conspiracy, I'd like to move briefly to the other elements. In this particular case, the jury was properly instructed on damages. Medical records were presented. Medical expenses were presented to the jury. The jury did not take, except in whole, all of the medical expenses of the plaintiff. They were about $11,300. Instead of giving him that entire figure, they agreed to pay him $8,000. There's nothing extraordinary about the verdict here in this case, which added up to about $78,000. The excessive use of force, the jury was properly instructed on the Graham standards. None of the defendants objected to any of such instructions. The jury was properly instructed as well that not every push and every shove constitutes a violation of the Fourth Amendment. They were also instructed that the standard, when there was a Section 1983 unreasonable use of force, was similar to the assault and battery standard. There was enough evidence in this case that Trooper fully exercised, used unreasonable force as he brought him, particularly if we accept the plaintiff's version of the fact that he was handcuffed as he was brought through the door, that use of force would be unreasonable. None of the defendants, surprisingly in this case, brought in motion for summary judgment on qualified immunity before the trial of this case. We presented evidence as well regarding the medical care that my client had. The statements and the yelling that my client does that he didn't want to die as he bleeds in the floor of one of these cells is wrenching. It's indicative that there was emotional distress, that a jury could have found that Trooper fully intended to inflict emotional distress on my client. And we also provided in Volume 3 medical records from the Greater Lawrence Hospital, his primary care clinic, where he indicated that he thought he was going to die, that he was having anxiety attacks, and so forth. Just very quickly, Counsel. Yes, Your Honor. The civil conspiracy charge matters in particular because it implicates the three defendants, but you have a number of theories of liability that implicate Officer Foley. If any of those, say one or two of them, or three of them, were to drop because there was something problematic, that wouldn't affect your entitlement to damages, right? No, Your Honor. Okay. So very quickly, on malicious prosecution, under what I understand to be black-letter Massachusetts law, the reasons for dismissal, and dismissal is essential for malicious prosecution, that the dismissal has to be consistent with the innocence of the accused. The dismissal here was pursuant to a plea agreement. How is that plea agreement consistent with the innocence of the accused? How do you reconcile those two? I don't see any heck versus humphrey issues. I'm sorry? I don't see any heck versus humphrey issues that preclude anything. I was part of that plea agreement, and the only thing that was agreed upon was that he was pleading to the OUI case. The resistant case was dismissed, and it turned in my client's favor, and that's why the malicious prosecution... Why does that matter if he pled to a criminal offense of driving under the influence? How can a malicious prosecution claim stand? That's the question. Well, I'm not claiming that it stands on the OUI. It stands on the filing of the charges for resistant arrest because if my client was under arrest and handcuffed behind his back... I thought that wasn't your primary theory anyway. It was the 1983 theory. Does it make any difference if you prevail on civil conspiracy? It's a unitary verdict. You have a verdict against all three defendants. Is it necessary that we even do an analysis of any of the other claims? I agree with you, Your Honor. I'm sorry. I'm smiling because very often when we pose questions that counsel like, the answer is I agree. That is just what happens in the courtroom. All right. Thank you. Your opponent has a minute left. Thanks. Thank you, Your Honor. With regard to the civil conspiracy, I believe all the case law requires that there be more... I didn't hear the beginning. I'm sorry, Your Honor. Speak up, please. Your Honor, with regard to the civil conspiracy, I believe all that the case law requires more than just the presence. There has to be some type of tacit or verbal agreement between the parties, and I suggest that at no point in time is there any evidence of that that was presented at the trial and therefore that there was no civil conspiracy between the defendants. How do you present evidence of a tacit agreement other than by showing the conduct of parties that is consistent with a common sense notion of a tacit agreement? Yes, Your Honor, and I think it also is consistent with something that would be just as innocent other than a tacit agreement. That's why we have jurors. Yes, Your Honor. So I had thought you might argue, well, even if there was evidence of conspiracy to cover up, that doesn't show there was any conspiracy that led to the injury. Is there any case law that says that? Or are you making that argument? Yes, Your Honor. There was no injury as a result of the alleged civil conspiracy. No, you've missed the point. The point is that a jury could work back from the fact that the various statements about what happened were inconsistent with the truth to conclude that there was a cover-up. And from the cover-up, they could conclude that the agreement actually started before the cover-up and started before the injury occurred. And I had thought you might be making an argument to that effect. And I'm asking, is that argument being made? And is there any case law to support it? Your Honor, I understand your position that they shouldn't feel that there was... That is my question. I understand your... I'm sorry? It's not a position. It's a question. A question. Yes, Your Honor. I believe that in this point in time that it's unfair to my clients for there to be a backtrack back from the event to it, but I'm not aware of any case law on that point. All right. Thank you. Thank you all. Thank you. All rise, please. Discussion of the United States Covert Appeal is now recessed. I say to the United States of America and this honorable court... Thank you.